Your Honor, this case only got to the 16th after a 1-1-8. People of the State of Illinois presented an attorney to the Baraka of Defendant McCutcheon, on behalf of the Defendant McCutcheon. It is the Chair of the Court of Appeals, on behalf of the Defendant's Attorney, Mr. Steven A. McCutcheon. Ms. Silver? Good morning, Your Honors. Counselor, may it please the Court, my name is Sherry Silver, and I represent Baraka Olla on behalf of the State Appellate Defender. Mr. Olla raised two arguments in this appeal. The first raised a challenge to the zero questions that were posed by the trial court during the voir dire. Judge Hallock asked the jurors if they took issue or they had a problem with the four propositions, and then he even prefaced some of the questions with the phrase, this one. And then he asked the individual principles. The State has conceded error on this, so unless Your Honors have questions about that portion of the argument, I'd like to just move on to the next issue. What about the possibility of harmless error? We were going to discuss plain error in just a moment, but harmless error, I'm not sure why harmless error would apply. This would be a plain error analysis because they weren't objected to. Is that all right? Okay. The second argument raised by Mr. Olla concerns the closing arguments by the prosecutors. In the initial closing argument, the prosecutor repeatedly told the jurors that they did not receive evidence of various issues. They didn't get the evidence of AF's knowledge and motive and all that kind of stuff. And page six to seven of the reply brief, we do set out the prosecutor's argument. And if I may quote, the prosecutor said to the jury, how does the 11-year-old know what white stuff coming out is, which we as adults know is ejaculation, at 11 unless she has seen it? If the prosecutor had stopped at that point, we wouldn't be here. I don't think that it would be possible to say that that was an incorrect argument because it asks the jurors to draw on their own life experiences. But the prosecutor went on and she said, you heard no evidence that she's watching R-rated movies. You heard no evidence that she heard it from kids on the playground. You have no evidence. Where is her motive to lie? Again, the prosecutor could have stopped at that point, but she went on and she said, where is your evidence of why she told this horrible story? You haven't heard any evidence of that because there isn't any. Is that a comment on the defendant's attack on the victim's credibility? I'm sorry, I didn't hear you, Judge. Is that a comment on the defendant's attack on the victim's credibility? Well, that's what the state's arguing in their brief. They cite People v. Curry for that. And this is not a question of credibility. If it had been credibility, there could have been a different way to handle this argument. But by telling the jurors, you have no evidence, then there's – especially in light of what happened with the Zare questions, we have that additional problem. The jury was not properly chosen because Judge Hallock didn't ask those questions in which it could be determined that they understood and accepted who had the burden of proof here, who had to present evidence. The defendant doesn't have to present evidence, and that's one of the propositions that they did not determine. Those areas were not preserved, correct? Yes, and that's when we get to the plein air. Let's talk about plein air. Why is it that it's supposed to be balanced in this case? Okay. As in SETI, we have three primary witnesses for the prosecution. We have A.F., we have Tawanda, A.F.'s mother, and Kathy Byrne. In amongst those three people, we have inconsistencies that go from A.F. to Tawanda, A.F. to Kathy Byrne. We have inconsistencies about the acts that may have occurred. We have inconsistencies about any number of things. SETI was a resisting arrest, pushing, shoving case, right? Single isolated incident, correct? Yes. And this is the case that the State presented was a ritualistic sexual assault against a child that happened in seclusion, correct? The only witnesses to what happened when they were alone together were the defendant and the victim, correct? To some extent. There was testimony that T.F., the brother, the older brother, in one of the alleged incidents Saw the defendant in bed with his front pump against A.F.'s back. Well, no, that's not exactly correct, Your Honor. What the testimony was, was that T.F. had been playing cards with his little brother. And he went to the bedroom where supposedly the three, the younger sister, A.F., and the defendant were in bed. And he knocked on the door. This is T.F.'s testimony. He knocked on the door and the defendant said, come on in. Now, if somebody were committing something criminal at that point, why would they say, come on in? They would say, wait a minute, just a second, give me a minute. But no, he said, come on in. And when he came in, the defendant got out of the bed, contrary to what A.F. said, I think it was A.F. who said that he jumped out of the bed. He got out of the bed and T.F. followed him and he entered the classroom. So is it your argument that in order for testimony of a witness to corroborate the victim, their versions have to match up identical step by step? Is that your argument? No, and that's not what Seve says either. Seve says there can be inconsistencies in amongst the testimony. And I'm just pointing out that there are inconsistencies. Would you agree that T.F.'s testimony in part corroborated the victim? To the extent that Mr. Oliveau was laying in the bed, that's about it. How about the 11510 statements? Are they corroboration? They can be used as corroboration, yes. But T.F. didn't testify then, as I recall. He did not testify. T.F. didn't testify at the 11510. I'm talking about the 11510 statements, the hearsay statements from both Tawanda as well as Byrne. The 11510 statements, aren't they corroboration? They can be, but in and of themselves. You have differences between what was said at the 11510 and what was testified to and what A.F. told them. You've got inconsistencies all over the place between the three people and the three different time periods that statements may have been made. How about the phone calls that the defendant made to T.F. to find out when he was going to be home? Mr. Oliveau would call T.F. after school to ask when he would be coming home from school. T.F. had testified that he participated in the Boys and Girls Club and things like that and would sometimes be home. I think there's some sports in there too, that he would be home a little bit later. I think common experience of a parent would be that they would call to check up and see when their kid is going to be coming home. But that in part, regardless of what common experience is, but that in part corroborate A.F.'s testimony that she was alone with the defendant. I don't think anybody is disagreeing that there was perhaps a 15 minute time period that she would be alone with the defendant. I don't think there's any question about that. In the defendant's own testimony, he acknowledged picking the defendant up after he went to McDonald's and driving her home, correct? Picking A.F. up, yes. And A.F. also testified to an incident regarding McDonald's, correct? There was a little inconsistency between the two there. His testimony was that he had already been to McDonald's. His testimony was also that he didn't go into the house, as A.F. said, that he had already been to McDonald's, correct? Correct. And he also acknowledged that he did the school play incident. He corroborated that as well, correct? Correct, to the extent that he said that he was working on his computer and that when the kids were bugging him, basically. And he also corroborated the fact that he told A.F. that she was beautiful, as she testified. Yes, there was testimony that was objected to as to the reason why he said that, but yes, there was. About the confrontation between the defendant and Tawanda, when Tawanda, in the presence of all three daughters, said, you've been licking my daughter, and the defendant then looks at A.F. and says her name, correct? Yes, but when you look at that, the age of the two younger girls, they were two and four years old at the time. I don't know that a two-year-old would have the knowledge to be able to say something like that. I don't know that a four-year-old would have necessarily had the knowledge. There's also the testimony that describes the layout of the apartment. Rather than saying, I don't know what you're talking about, the defendant named A.F. Because she was standing in the doorway of the bedroom where, supposedly, this accusation had just been made. And when the defendant was told to leave, he left and did not return, correct? Correct. Is that a normal reaction of somebody who's innocent of any criminal wrongdoing? I don't know what would be normal, Your Honor. Could that be taken by the jury as an admission by conduct, an admission by silence, and just accepting the accusation and leaving and not saying, what are you talking about? I live here. Let's get to the bottom of this. It could, but I'd also point out that the jury was hung. They came back with a note saying they were a hung jury, so they were having issues with the charges that were leveled against them and the evidence. Well, the jury found the defendant guilty of several offenses but not guilty of several others where, obviously, it determined there was not sufficient corroboration, correct? Correct. Okay. Correct. Was there anything in the record to show the victim's motivation to make this up? No, and that's one of the questions that the prosecutor had said to the jury. We don't need to show that there was a motive. I'm not asking if the defense showed that there was a motive. I'm just saying, was there anything in the record to show her motivation to make this up? Not that I can recall, no. Was there anything in the record to show how she would know certain sexual acts? You know, if she had seen some movies or whatever, anything in the record to show how she would have come up with this other than it having happened to her? Having never seen The Walking Dead, I don't know if there's anything in that show or movie that would lead to anything. I have no idea. There wasn't any evidence. I haven't seen that either, but there wasn't anything in the record to say, on The Walking Dead, this shows this type of stuff. No. Okay. No. She described fairly accurately, not fairly accurately, accurately what happens when an adult male is ejaculated or is masturbated, correct? Yes, but quite honestly, Your Honor, I can't remember if that was Tawanda's version of what she said AF told her or if that was really what AF testified to. I believe it was both. I think it might have been both. Yes, I think you're right. So isn't the jury entitled to look at what the evidence is and what the evidence is not in evaluating whether or not the state has proven the defendant guilty beyond reasonable doubt? Yes. Is this the likelihood or the reasonableness of a child's testimony? Yes, but I'm going to go back to Sebby. On this plain error issue, we're not looking at a reasonable doubt situation. We're talking about the closeness of the evidence, and as Sebby says, it's not the sufficiency of the closeness. It's the closeness of the sufficiency. So we have the witnesses for the prosecution, inconsistencies that there are. We have a defendant who was partially corroborated by TS testimony. So you have these two cases, neither of which are implausible, neither of which are fanciful, neither of which are incredible, and that's what Sebby says. When you have a situation like that, you take the common-sense approach and you go, this is pretty close, pretty darn close, and that's the situation that we have. The fact that the jury found the defendant not guilty of five or six or seven counts would relate to lack of evidence beyond reasonable doubt as at least to those charges. What about the charges that they found the defendant guilty of? Was the evidence insofar as the convictions were concerned, were they close or were they not close? Because of our system, we do not know which counts, if all of them, none of them, part of them, that the jury was hung on. We do know that, yes, they convicted on four counts of the ad crim sex abuse and one count of predatory. They acquitted him on all the others. What we do know is that the jury came back. They were out for seven hours. They came back at some point and said, we're a hung jury. There's no indication that I can find in the record saying what the time period was after that instruction to go back and keep deliberating went back and when they came back with their verdict. We don't know if this was a compromise. We don't know if this was just some juror saying, okay, we'll convict on these because otherwise we're going to be hung. Does the fact that they found the defendant guilty on so many charges have any ameliorating effect insofar as the failure to properly admonish the jury? I think this all comes back to that. I think that it all comes back to the fact that they were not properly questioned at the beginning. They did not have adequate understanding of what the burden of proof was, who had the burden of presenting the evidence. They did not understand that the defendant didn't have to present anything. They didn't understand that he didn't even have to testify if he didn't want to, but he, in fact, did. So it does come back to all that, and it does come back to Judge Hallett's improper admonishments and questioning during the Zarek portion of the wadir. Doesn't Sebian Mayer stand to the proposition that a closing balance case is where neither party is, neither version is supported by extrinsic evidence and it comes down to credibility contest, correct? Correct. What's the purpose of 11510 statements? What was the purpose of that legislation? Well, to allow statements that are found to be reliable, yes. And the Supreme Court said to corroborate the child's in-court testimony, correct? Right. In fact, they are evident that it is the General Assembly, an act of that provision, to provide corroborating evidence in light of the difficulty of convicting persons accused of sexually assaulting children. Right. That's what the court said. Right. So how can you say that it was not corroboration? AF's first outcry to her mother was, Dad, rape me. She woke up to one and said, Dad, rape me. Right. In amongst all of her allegations of what happened and Tawanda's version of what happened, there's nothing that correlates with what the common understanding of rape is. So there's a question there, really, about how much it did corroborate, her testimony of the child did corroborate what was said at the 11510 hearing. There's a question about that. I didn't raise it as an issue because I think these were stronger. But I don't know that in every instance the statements that are found to be reliable in the 11510 hearing truly do corroborate what does come out later on in testimony in a trial because time passage. You've got people who are remembering things differently over time. The state relies on people versus Lara to show that a young child is going to have a reduced memory. We've got the opposite here. You've acknowledged that there are several pieces of evidence that if viewed by the jury as corroborative, they would be corroborative, correct? Correct. The 11510 statements, the defendant's reactions, T.F.'s testimony, the defendant's own admissions to certain, at least being with the child on certain occasions. But now you're asking us to basically go through and evaluate whether or not those pieces of evidence are truly corroborative, correct? Under the plenary analysis, yes. I mean, isn't that the jury's decision to decide whether or not they corroborate or don't corroborate? That is extrinsic evidence that corroborates the child. You're asking us to say, no, it really doesn't, correct? Correct. That is exactly what we're asking Your Honor to do, yes. Okay. So we're asking you to reverse the convictions and send it back. Thank you. I'm sorry, Justice McClaren, you looked like you had a question. Are you aware that 11510 altered the rules of evidence regarding hearsay? Altered it in what way that it's allowing you? Before 11510, most of the corroborative statements would have been nothing more than hearsay. Oh, yes. And so what has transpired with 11510 is it allowed hearsay, a lot of court statements made by the victim, as well as people who were supposedly conversing with this victim. Correct. And turned it into substantive evidence that the jury could weigh as they saw fit.  Thank you. Thank you, Your Honor. Mr. Rogers. Good morning, Your Honors. Good morning, Counsel. May it please the Court. My name is Stephen Rogers, and I represent the people of the state of Illinois. As Your Honor alluded to in the discussion with Counsel, this is really a plein air case. Whether the evidence was closely balanced.  And make a qualitative, common-sense assessment. And it's the state's position that using common sense and looking at the qualitative nature of the state's evidence, that this was not a close case. Your Honor, as you alluded to, Justice Burkett, in setting of Daniel, you have resisting cases, obstructing cases, where there's a crowd of people, and you usually have numerous witnesses on each side. They agreed on nearly everything except the criminal conduct. Did the defendant pull away? Did he push? Those are really close cases where neither side is corroborated by extrinsic evidence. But in this case, the defendant's own testimony corroborated nearly everything that AF said, except that the abuse occurred. There was nearly always a period of time when AF got out of school that they would be alone. And the defendant even called AF his alarm clock. She would come home from school. He was there. The last incident, his explanation was really odd that he went the opposite way to McDonald's, wasn't going to come back and pick her up, but ends up around the bus stop. And then a friend relays to AF that he was there. Also, with TF's phone calls, it's not odd for a parent to call a child to ask when they're going to be home. But TF testified that he would only call to ask when he would be home, not because the kids were coming home or the cable guy's going to be there at 4.30. Can you meet him? It was simply, when will you be home? And the implication is he needed to make sure he had that period of time. You would agree that there were some substantial inconsistencies also, correct? Absolutely, Your Honor. And I went back through it because when I first read through it, I don't think I was putting together all the defense questioning. And there's actually a page where, I mean, the questioning is almost impossible to follow, especially for a child, because defense counsel asked him, did you tell your mother how this was happening? And then he asks, did Barack ever offer you cookies? Do you remember telling your mother that he offered you cookies? Do you remember telling Investigator Byrne about an incident? And then, I mean, it's going back and forth amongst all of the different conversations because AF had discussed with her mother on multiple occasions the abuse. Her mother had discussed it twice with Investigator Byrne. AF had had her conversation with Investigator Byrne. And so a lot of the inconsistencies were related to did you tell so-and-so, and it would get confused. But I will admit that even on the substantive testimony, there were a couple instances where AF said something didn't happen that she relayed did happen in the video. But the jury acquitted on, I believe it was six of the 11 counts that made it he was convicted. The jury watched the video again during deliberations, correct? They asked to see it. Yes, Your Honor. And I think from my reading of it, they went almost the least common denominator. What was perfectly consistent throughout, that was a conviction. If there were any inconsistencies that she later denied, that was an acquittal. That's what we expect the jury to do, and that really gets at the heart of the Zegger principles. AF testified that the defendant would give her money after these incidents, correct? Yes, sir. Did he admit that? No. Was he asked about that? I don't believe he was asked. I mean, they may have asked him something, did you give her money, but I don't remember if that was part of the question. How is the oral argument of the state relating to the lack of evidence when the jury wasn't properly admonished about the defendant doesn't need to testify or present any evidence? What's the implication there insofar as whether or not the failure to admonish properly was prejudicial error? Well, Your Honor, on the last two Zegger principles, that the defendant is not required to offer any evidence and that the defendant does not have to testify is interesting in this case because he does testify. So it wouldn't be a situation where the jury would have held it against him. Because he did testify and he actually offered other evidence. He offered evidence that he complied with any request from the CAC. So I think it would be more prejudicial in a situation where the defendant does not testify and the jury is not asked if they understand and accept. Well, the closing argument indicates that the emphasis was on lack of evidence. What's the implication or the inference to be drawn from addressing the lack of evidence? Your Honor, so there are two separate closing argument issues. One is lessening the burden of proof and one is shifting. And I think pointing to the lack of the evidence went to the shifting of the burden of proof. We have to remember that was not preserved. And in this Court's plain error jurisprudence regarding shifting the burden of proof, it has to be pretty inflammatory statements. You know, defendant did not establish X, Y, or Z. Here the State pointed out that there was no evidence that she gained this sexual knowledge from any other place except the defense. If the State could say the same thing artfully and say, how does A.F. know as opposed to there's no evidence? Yes, Your Honor. The State could go about it a different way. But essentially the point was made that this stuff just doesn't happen. Well, exactly. And the defense in closing argument tried to say a 13-year-old could know about this in a lot of ways. Well, she's 11 when she reports. She's in sixth grade. I don't know. There was no evidence that kids are taught sex education in sixth grade or before that. But the defense's whole case was she was completely fabricating this. And even in closing, the defense went through that although there's no evidence that she gained the sexual knowledge, she could have heard about it from her friends, her brother. She could have watched R-rated movies, but she could have had sex education in school. So the defense had no problem lobbying out potential scenarios. And so I don't think it was. Did the defense ask those questions when A.F. was on the stand? No, Your Honor. No one asked it. You know, when the State says there's no evidence, the evidence could have come in any number of ways. A.F. had the interview with Investigator Byrne. She could have mentioned at that point that she just had a sex education class. That's how she knows it's rape. I mean, any number of ways. T.F. testified. He could have said they watch R-rated movies around the house. I mean, it could come in any number of ways outside of the defense presenting their case. And also, defense's point about where it was well taken, it was the reverse, about when it became more specific later. But Investigator Byrne explained that role and disclosure is a common occurrence in sex abuse cases where you might remember more details later or remember an act differently. Do you have a recollection different from Ms. Silver relative to the length of time from the jury indicating that it was hung vis-a-vis or in relation to their return of the verdicts? I do not, Your Honor. I know in some records it's specifically labeled. I do not believe it was here where the jury said it was hung and then came back with the guilty verdicts on some accounts. If Your Honor don't have any other questions, the State respectfully requests that this Court affirm defendant's convictions. Thank you. Thank you. Ms. Silver? I don't believe we have any, Your Honor. Okay, we'll take the case under advisement. We have other cases on the call. Court is adjourned.